William E. CRAIG, Burlington Northern, Inc., United States Railroad Retirement Board and James Cowen, Neil Speirs and Wyeth Quarles, Members of United States Railroad Retirement Board, Respondents,

v.

JO B. GARDNER, INC., J. Arnot Hill and Sloan R. Wilson, Individuals d/b/a Hill & Wilson, Appellants.

No. 60803.

Supreme Court of Missouri, En Banc.

Sept. 11, 1979.

Jo B. Gardner, Monett, for appellants.

E. Eugene Harrison, Ronald S. Reed, Jr., Vernon A. Poschel, Kansas City, Dale G.

Zimmerman, Gen. Counsel, Railroad Retirement Bd., Chicago, Ill., Philip C. Ehli, Kansas City, for respondents.

SEILER, Judge.

This case is a consolidation of separate appeals by two law firms, Jo B. Gardner, Inc., and J. Arnot Hill and his associate, Sloan R. Wilson, from a judgment in interpleader in the Jackson County circuit court. The main dispute is over a fee. Appeal was originally taken to the western district of the court of appeals, but the cause was transferred to this court prior to opinion because within our exclusive appellate jurisdiction under Mo.Const. art. V, § 3 (1945), since the constitutional validity of a portion of the Railroad Unemployment Insurance Act, 45 U.S.C. § 362(o) (1976) is at issue. Gardner asks us to determine whether the circuit court correctly awarded to Hill attorney fees of 25 percent of a recovery by Craig, plaintiff in the main action (a federal employers liability action, known as an FELA claim) and a defendant in interpleader, from his employer, Burlington Northern, Inc., and 40 percent to Gardner, with Hill's 25 percent taken from Gardner's percentage due to the latter's promise to pay any fees owing to "other attorneys" by Craig. Secondly, we are asked to decide whether the United States Railroad Retirement Board can constitutionally claim a right to recovery under 45 U.S.C. § 362(o) of all sums paid by it to Craig from the amount collected by him in his judgment against Burlington Northern[1] and, if so, can the Board do so without payment of a portion of Gardner's attorney's fees. Finally, Hill argues in his cross appeal that the court erred in failing to award him his proportionate share of the income produced on the interpleader fund, in addition to his attorney fees.

The facts are somewhat involved. Briefly, Craig was allegedly injured twice during the course of his employment as a switchman for Burlington Northern, Inc., a railroad, at its hump yard in North Kansas

---

1. As it turns out, the constitutional issue is not reached, see *infra.*

City. The first accident allegedly occurred on September 5, 1971, the second on September 14, 1971. On December 18, 1971, Craig employed J. Arnot Hill to represent him in a suit against Burlington Northern. The portions of said contract pertinent to the issues before us stated:

"I, the said William E. Craig, hereby employ J. Arnot Hill as my attorney to prosecute my claim against the Burlington Northern Railroad in a claim for damages for injuries to my person sustained as the result of an accident which occurred on or about the 5th day of September, 1971, in Clay County, Missouri.[2]

"As full compensation for his services, I agree to pay my said attorney a sum equal to 25% of whatever amount may be recovered either by settlement, suit or compromise and I hereby authorize my attorney to file suit on the above claim."

On February 28, 1972, Hill filed a petition in one count in the Jackson County circuit court against Burlington Northern, Inc., alleging injury from both accidents. Sometime in 1972, Wilson joined Hill's firm, and took over the handling of Craig's case.[3] Hill did not know whether Wilson had had any prior FELA experience. Both Hill and Wilson had had trial experience, although Hill's experience was mostly in the criminal area.[4] Neither had ever litigated an FELA action like Craig's although Hill had settled three FELA actions before trial. As detailed later herein, Craig became dissatisfied with their representation.

On July 5, 1973, Craig informed Wilson that he had decided to employ Gardner, who had had broad experience in FELA litigation. Craig and Gardner entered into a contract on July 9, 1973. In relevant part the contract stated that Craig hired Gardner to represent him in:

"the presentation and prosecution of a certain cause of action he has against Burlington Northern Railroad Co., Inc. and against all others liable for personal injuries and damages on or about the 5th day of September and the 14th of September both in 1971, caused by the negligence of said company . . .

. . . and for its attorney fees second party Gardner shall have thirty-five percent of all sums before case is set for trial and 40% thereafter, after deducting doctor and hospital bills incurred for the purpose of preparing and presenting said claim . . . and in case nothing is recovered, the Second Party shall have nothing for his fees and expenses . ."

Added to the top of the contract, in longhand, appeared the following sentence:

"It is understood that 2nd party shall pay out of its fee any sums due and owing to other attorneys now employed by first party, but does not agree to defend any suit for attorney fees brought on behalf of other attorneys."

On July 30, 1973, Craig wrote Hill and Wilson, dismissing them as his attorneys. Gardner amended the petition previously filed by Hill extensively, including dividing the suit into two counts, one for each accident. Count I was for the first accident, claiming negligence on the part of the railroad in failing to provide a safe place to work and count II was for the second accident, claiming violation of the federal Safety Appliance Act, where negligence and contributory negligence are immaterial.

On November 12, 1973, a jury returned a verdict for Burlington Northern on the September 5, 1971 accident, but for Craig on the September 12, 1971, accident, in the amount of $20,800.00.[5]

---

2. The contract makes no mention of employment with respect to the accident and injuries of September 14, 1971.

3. Whatever interest Wilson has comes through being an associate of Hill. Wilson had no contract with Craig at any time.

4. Mr. Hill was admitted to the Missouri Bar in 1936. Mr. Wilson was admitted in 1965. Mr. Gardner was admitted in 1936.

5. The case was tried in Kansas City. The trial lasted two or three days. The railroad defended on the ground that the alleged accidents did not take place and that, in any event, Craig was not injured.

On November 16, 1973, Burlington filed this interpleader action to determine to whom it should pay the judgment. It paid the sum of the judgment, plus interest, into court, and was dismissed from the action. The money was invested and ultimately grew to $24,385.04. At the conclusion of the interpleader hearing, September 9, 1976, the circuit court allowed the Railroad Retirement Board $2,514.60 in reimbursement for the sickness benefits paid Craig by it prior to suit, assessed court costs of $32.50 against the fund, allowed $8,320.00 in attorneys fees (40% of $20,800.00), of which $5,200.00 (25% of $20,800.00) went to Hill and the balance of $3,120.00 to Gardner (the court determined that Hill's fee should come from Gardner's share because of Gardner's promise to pay any attorneys fees due and owing by Craig at the time of his employment of Gardner), $3,774.35 to Gardner for expenses incurred and the balance of $9,753.59 to Craig. Both Hill and Gardner appealed, raising the issues noted above. With the exception of the $5,200.00, the fund has been disbursed to the parties in the respective amounts stated above.

## I.

The main controversy is between the opposing lawyers over who receives what fee, into which dispute are interwoven charges and counter charges as to unethical conduct and respective competency in handling railroad cases. Gardner contends Hill had no contract with Craig with respect to the cause of action on which recovery was had, that at the most there was an implied contract between Hill and Craig, on which the remedy would be in quantum meruit, that even then there was no substantial performance by Hill and that Craig was within his rights in discharging Hill. Hill contends that he had a contingent fee contract, represented Craig competently and is entitled to 25 percent of the amount recovered; that Gardner's conduct was "unbecoming", that he "snitched" or stole the case and erroneously assumed there was no substantial performance by Hill. To resolve these matters, we first must set forth more of the facts, particularly those bearing on what

Craig's original lawyers, Hill and Wilson, did or did not accomplish on his behalf prior to their discharge.

 Initially we note that the relation between a lawyer and his client is a delicate and exacting one, highly personal, 7 Am. Jur.2d Attorneys at Law, § 92, at 105 (1963). The cause of action or claim which is the subject of the contract between lawyer and client is the property of the client and not the attorney. *Mills v. Metropolitan St. Ry. Co.*, 282 Mo. 118, 221 S.W. 1, 4 (1920). If plaintiff were dissatisfied with his attorneys he had the legal right to discharge them and employ other counsel, *Allen v. Fewel*, 337 Mo. 955, 87 S.W.2d 142, 145 (1935); *In re Downs*, 363 S.W.2d 679, 686 (Mo. banc 1963); *McLaughlin v. McLaughlin*, 427 S.W.2d 767, 768 (Mo.App. 1968), subject to the attorney's right under certain conditions to be paid a fee, *In re Downs*, 363 S.W.2d at 686; *In re Thomasson's Estate*, 346 Mo. 911, 144 S.W.2d 79, 83 (1940).

The petition originally filed by Hill erroneously set forth the places where the accidents alleged to have been sustained by Craig occurred. Hill's petition alleged that both accidents occurred in a repair building—the first while plaintiff in carrying out his duties as a switchman, was uncoupling a freight car in said building, and the second when he was again working in the same building and reached in to open a knuckle between freight cars when other cars were suddenly set in motion against him. Craig repeatedly pointed out to Hill and Wilson that the two accidents did not happen inside a building at all but occurred in the hump yard on what was known as No. 1 rip-track or repair track No. 1 north of the repair building. Craig himself drafted and delivered to Hill a proposed amendment, in which Craig named the specific paragraphs of the petition which should be amended, setting forth in direct and clear language what had happened and where it took place. Hill and Wilson, however, did nothing about amending the petition, nor did their interrogatories to the railroad inquire as to the

location of the accident. Wilson's explanation was that the railroad lawyers had taken the deposition of the plaintiff, and hence the railroad was aware where plaintiff contended the accident occurred. Therefore, he reasoned, an amendment of the petition just before trial to state correctly the place of the accident would not inject a new issue into the case, so as to produce a last minute delay or continuance. Whether or not Hill and Wilson were correct in this assumption, to Craig, a layman, it appeared his lawyers were ignoring his concern over what he regarded as an important error in the petition.

As time passed, Craig became aware that Wilson, who was the one looking after the case, was not well informed as to the day-to-day work of a railroad switchman and how switching operations were conducted in defendant's Murray yard in North Kansas City, Missouri. One of Craig's concerns was that he knew the company's lawyers were familiar with the railroad and its operation; that railroaders have a language of their own when they are referring to such things as hump yards, or to cut a car, or to shoving, dragging, pulling, and flying switches; that neither Hill nor Wilson showed any familiarity with any of these terms or their meanings.

■ Although Craig testified that the railroad employees have to work by the rule book and the safety rules, neither Hill nor Wilson displayed any interest in the rules or sought to obtain copies.[6] The attorney for the railroad testified that the rules were directly involved with respect to the second accident and that the rules must be pleaded in order to instruct on them as negligence per se.

Neither Hill nor Wilson at any time sought to go with Craig to the accident scene and have him point out what happened, nor did they do anything about taking any photographs of the place of the accidents, although they alleged, with respect to the September 5, 1971 accident, that plaintiff slipped and fell between the rails on an accumulation of oil and grease and other foreign matter. The railroad lawyer testified he believed pictures should be obtained as soon as possible.

Wilson testified about a settlement conference which he and Craig had with the railroad's lawyer where the railroad had made a proposition that Craig be "elevated" to the position of hump foreman, which was not as strenuous a job as switchman. Wilson's testimony was that Craig did not want that job. Craig, however, testified that a hump foreman is no more than a switchman with enough seniority to hold the job. Craig could not have held the job because he did not have enough seniority, so as he put it, there was "no deal there whatsoever".

Craig also was upset over the way Hill and Wilson handled him with respect to preparing him for the thorough deposition which the railroad lawyers took. Wilson told him over the telephone it was nothing to worry about, that the lawyers were interested in the accident and to tell the truth. Consequently, said Craig, he worked the night before the accident, which left him sleepy and at the deposition it turned out that the railroad lawyers spent little time on the accident, but examined him in detail about his entire life and background up until the accident (Craig apparently had had a major accident prior to his railroad accident). Wilson testified he discussed the case with Craig thoroughly before the deposition, had him read written instructions on what to do in a deposition and told him to tell the truth and not volunteer.

■ The original petition was prepared by Hill, who said he considered federal employers liability accident cases easier than ordinary cases because the Act "gives you the edge".[7] Hill included both accidents in

---

6. Failure to adhere to a railroad safety rule is evidence of negligence. *Renaldi v. New York, New Haven & Hartford Rds. Co.,* 230 F.2d 841, 844 (2d Cir. 1956); J. Dooley, Modern Tort Law, Vol. 1, § 3.29 at 58; § 28.12 at 141 (1977); Ann. 50 A.L.R.2d 16 (1956).

7. That this is not necessarily a correct assumption for a plaintiff can be seen by examining

a single count, charging the railroad in substance with failing to provide a safe place of work. It was apparent from the allegations contained in Hill's original petition that the case might involve a violation of the Safety Appliance Act, because he described the second accident as occurring when plaintiff reached in to open a knuckle between freight cars, an act not needed had the coupler been working properly. Under the Safety Appliance Act, obligations imposed on the railroad carriers are of an absolute nature. They do not depend upon the exercise of reasonable care. Liability follows from the mere use or maintenance of defective equipment and contributory negligence or negligence are not issues in the case.[8] Hill admitted he had no knowledge of the Safety Appliance Act. Wilson stated that he was aware of the Safety Appliance Act, but in his opinion it had no application to Craig's case. The count, however, on which the jury returned the verdict in favor of Craig for $20,800 was the count based on violation of the Safety Appliance Act.

From time to time Craig was after Hill and Wilson to take the depositions of the train crew and fellow workers whom he knew had been contacted by the railroad. He expressed his concern over the failure of Hill and Wilson to take these depositions or obtain statements from such witnesses. According to the lawyer for the railroad usually the depositions of the other railroad employees and supervisory personnel are taken by plaintiff's counsel at or near the time plaintiff is produced for his deposition.

Wilson was interrogated about the failure to take these depositions. His explanation was that there was still plenty of time to do it, that it could be done shortly before trial. He also was asked about his failure to take the deposition of one George Reitz, a foreman who was in the tower at the time of the accident but was some distance away from where the accident occurred. He defended his failure to do that on the ground that Reitz was a favorable witness and he did not believe in taking depositions of favorable witnesses because this simply gave the other side an opportunity to locate evidence to be used in rebuttal. He conceded the same reasoning would apply in reverse with respect to his taking the deposition of witnesses who might be adverse to plaintiff, but did not explain how these depositions could be taken at the last minute and nevertheless leave him time to obtain evidence if it could be found to rebut such witnesses.

Wilson testified that he interviewed Mr. Craig, talked to him each week, and generally familiarized himself with the case. He prepared two sets of interrogatories, which requested names of witnesses and other information similar to that requested of Craig by the railroad's attorney. The firm obtained several brief medical reports from Dr. Riller, Craig's first physician, and two from Dr. Lippman, his second and treating physician, as well as a copy of the medical report prepared by the railroad's doctor.

In response to an inquiry regarding settlement, Wilson did economic research to determine the value of Craig's job and made a settlement offer of $25,000 if Craig kept his job, or $150,000 if not, to which the railroad did not respond. He interviewed Mr. Reitz, and had interviewed other witnesses, although he took no statements of the latter. He did not wish to interview favorable witnesses. He was aware of the rule books governing railroad operation and planned to get them before trial. He resisted, but lost, a motion to produce Craig's income tax returns; filed (and settled two weeks after Gardner entered the main case,) a claim against Craig's insurance company for medical bills for $650.00 (for which he was paid a fee of $200.00) and

---

the annotations found in 45 U.S.C.A., § 51. This would be particularly true, where, as here, the railroad was defending on the ground the accidents did not actually happen, and that even if they did, plaintiff suffered no injury.

8. "Every railroad case, whether it be an employee or nonemployee action, should be studied, examined, and dissected, to determine whether there is a possible Safety Appliance Act violation." Dooley, *supra*, note 6, Vol. 2 at 190.

reached an agreement with the railroad, following filing of an injunction action, that Craig need not file a new medical report for each day he was unable to complete his shift because of his injuries.

Hill and Wilson argue that there was ample time for them to amend the petition to include a correct description of where the accidents occurred and to correct any other inaccuracies (a note to do so was in Craig's file), to take depositions if necessary, and to familiarize themselves with the rule books governing operation of the railroad yard, which Wilson was aware existed. Wilson conceded they were not ready for trial at the time of their discharge.

Finally, in July 1973, after the case had been pending some 19 months, Craig called Hill's office to inquire about the status of his case. He was told by a secretary that the case was set for September 17. He asked to talk to Hill and was told that Hill was on vacation in the Bahamas and would not be back for four or five weeks. Despite the fact that Wilson had been the one to whom Hill had turned over the case, Craig always considered that Hill was his main lawyer and would be the one to try the case. He therefore became extremely concerned because he did not see how, with the case set for September 17, with all the work that remained to be done, and with Hill not scheduled to be back until sometime in August, that Hill could possibly be ready and meet the railroad lawyers on an even basis. It was at this time that he determined to hire some lawyer who was expert in the trial of railroad cases and learned of Gardner and his reputation in that field.

We conclude from the evidence that, although Hill and Wilson accused Gardner of stealing or "snitching" Craig's case from them, there is no evidence in the record to support any such assertion. Craig is the one who sought out Gardner. He telephoned Gardner and asked him to come to Kansas City. Gardner did so and Craig explained the situation. Gardner said he would be willing to enter the case and work with Hill and Wilson. He called on Wilson and went over the contents of Wilson's file.

Gardner concluded Wilson had done nothing which would be of any material assistance in successfully handling the case. He concluded further that neither Hill nor Wilson had any real knowledge of what was involved in preparing and trying such a case. Gardner therefore decided that he would have to proceed alone but he promised Craig that he would reimburse Craig for whatever fee, if any, it was ultimately determined that Hill and Wilson had coming from Craig. On July 30, 1973, Craig wrote Hill, terminating his services as his attorney and asking for an itemized bill for services rendered to date. On August 6, 1973, Gardner entered his appearance as counsel in the case. Hill wrote Craig on September 11, 1973 saying that if Craig had retained additional counsel it was at Craig's expense. Hill said they were reducing their percentage lien against whatever was recovered to "a reasonable amount" and also said that if Craig in his July 30 letter was guaranteeing payment of their fee based on hours spent then "we shall attempt to reconstruct the number of hours we have spent." There is no evidence in the record as to hours, however.

Gardner promptly upon his entry into the case, filed the amended petition mentioned earlier, pleading the pertinent safety and operating rules, investigated the facts, interviewed the train crew, took their depositions, took photographs of the scene of the two accidents, filed additional interrogatories, met with the doctors, arranged for additional medical examination, and proceeded to trial, which, as said, took place in November 1973, approximately four months after Gardner entered the case.

## II.

Is Hill entitled to a 25 percent contingent fee?

The trial court found that Hill had a written contract with Craig to represent him on both claims against the railroad, that Hill was competent in his representation of Craig and was discharged without fault on his part, that Hill had the option of treating his contract as rescinded and re-

covering the reasonable value of his services or recovering the stipulated contract percentage applied to the judgment recovered by the other lawyer, and that Hill was entitled to 25 percent of the amount recovered, or $5,200. As developed herein, we disagree as to Hill's having a written (or even an oral) contingent fee contract with Craig as to the second accident (which is the only one on which a recovery was obtained) and from this it necessarily follows that we disagree as to the fee to be allowed, which, in the final analysis, is the crux of this case.

■ As seen earlier, the only contingent fee contract Hill had was with respect to the first accident, on which the jury awarded plaintiff nothing. The contingency of recovery in regard to that accident, therefore, never occurred. Although it unquestionably is true that there was an implied contract by virtue of what took place as events moved along between Craig and Hill with respect to the second accident on which Hill has rights with respect to quantum meruit recovery, as discussed later herein, there was no written contract on both accidents. Parol evidence may not be used to vary or contradict terms of an unambiguous and complete written instrument absent fraud, common mistake, accident or erroneous omission. Here neither Hill nor Wilson claimed that the second accident was left out of the written contract through such accident or mistake, but rather that the contract by its terms was meant to include the second accident also. But, the contract is not vague on this point. Parol evidence may not be used to create ambiguity in an otherwise unambiguous contract or to show that an obligation is other than that expressed in the written instrument. While collateral facts and circumstances may be introduced to ascertain the subject matter of the contract and to aid in interpreting it, such facts cannot cause the court to read into the contract something which it does not say.

■ Hill and Wilson nevertheless state that the court properly permitted Hill to testify that the parties understood the contract to cover both accidents and that Hill had filed his petition as to both accidents. The record shows, however, that the trial court sustained Gardner's objection to Hill's conclusion as to how the parties interpreted the contract. The court did permit Hill to go on and state that he filed the petition as to both accidents as a result of the contract. However, this does not aid Hill's position. We are left with a series of facts which show that Craig claimed two injuries, discussed these with Hill, but signed the contingent fee contract only as to the first injury. Subsequently Hill "as a result of the contract" filed a petition against Burlington Northern, Inc., covering both accidents. We can but conclude, inasmuch as no claim of accidental omission is made, that Hill for some reason chose to contract for a contingent fee only as to the first accident. We could only speculate as to his reasons. Clearly, however, even looking at the surrounding circumstances, no implied inclusion of the second accident in the written agreement may be inferred.

■ Hill and Wilson make no claim that a second, and oral, agreement for a contingent fee was reached as to the September 14, 1971 accident. An oral agreement for a second contingent fee agreement cannot be implied from the mere fact that Hill and Wilson filed as to the second accident also. While we have not found a Missouri case on the point, what law there is on the subject holds that a contingent fee agreement must be express, never implied. *See, generally, Warner v. Basten,* 118 Ill. App.2d 419, 255 N.E.2d 72 (1969) (a contingent fee agreement must always be express, never implied); *Wells v. Haynes,* 101 Ga. 841, 28 S.E. 968 (1897). There can, of course, be an implied contract of employment with an accompanying implied promise to pay the reasonable value of the service rendered. But to imply a contingent fee would be to imply a definite or fixed percentage. This should be the subject of an express agreement, written or oral, and not implication. The canons of ethics stress the advisability of lawyers and clients coming to an early and clear understanding as to the fee, preferably reduced to writing,

especially where a contingent fee is involved. Rule 4, EC 2–19. We do not favor attempts at implied contingent fees.

### III.

Is Hill entitled to a quantum meruit recovery?

 Craig was aware that Hill and Wilson had filed a petition as to both accidents, and he acquiesced in its filing. A promise to pay the reasonable value of an attorney's services is implied where there is no express contract, if the services are accepted by the client or rendered at his request, *Connor Realty Co. v. St. Louis Union Trust Co.,* 176 Mo.App. 260, 161 S.W. 865 (1913); *Woodruff v. Rusk,* 229 Mo.App. 119, 76 S.W.2d 709 (1934); *Union Electric Co. v. Jones,* 356 S.W.2d 857 (Mo.1962), and recovery may be had in quantum meruit, *Elliott v. Empson,* 555 S.W.2d 46 (Mo.App.1977); *Warder v. Seitz,* 157 Mo. 140, 57 S.W. 537 (1900); *Wells v. Haynes,* 28 S.E. at 969, to the extent of the reasonable value of the lawyer's services to his client.

 Gardner contends, however, that Hill has no right to press his claim for recovery in the interpleader action, since the latter sounds in equity, *Kearney Commercial Bank v. Deiter,* 407 S.W.2d 575 (Mo. App.1966), and quantum meruit is a suit at law. We note that an action for an attorney's lien is one in equity, rather than at law, *Fein v. Schwartz,* 404 S.W.2d 210, 228 (Mo.App.1966). The fact that quantum meruit relief is normally granted in an action at law is not a bar to our right to grant it herein, assuming such relief is otherwise proper. Once a court of equity has rightful possession of a case, as is true here, it will not relinquish it short of doing complete justice, within the scope of the pleadings and evidence, particularly under a general prayer for relief, *State ex rel. Willman v. Sloan,* 574 S.W.2d 421, 422 (Mo. banc 1978); *Willman v. Beheler,* 499 S.W.2d 770, 778 (Mo.1973), even though it must render relief traditionally legal in order to do so, *Perry v. Perry,* 484 S.W.2d 257 (Mo.1972), and even if the litigant has mistaken the specific relief to which he is entitled, *Cannon v.*

*Bingman,* 383 S.W.2d 169, 173–174 (Mo.App. 1964); *Miller v. Haberman,* 359 Mo. 1012, 224 S.W.2d 1002 (1949).

 Of course, if Hill and Wilson's petition had been based solely on their contract, we could not sua sponte grant unrequested relief in quantum meruit, *Hadley-Dean Glass Co. v. Kay,* 118 S.W.2d 31, 32 (Mo.App.1938); *Wright v. Fick,* 303 S.W.2d 157, 159 (Mo.App.1957). However, it is permissible to ask for alternative relief, either on the contract or in quantum meruit, rule 55.10; *see Norman Schuman Interiors, Inc. v. Sacks,* 479 S.W.2d 200 (Mo.App.1972). In their answer to the motion for interpleader, Hill and Wilson stated:

> "Sloan R. Wilson and J. Arnot Hill request a hearing . . . to allow said attorneys to prove their contract with plaintiff, *or in the alternative the fair and reasonable value of their services to plaintiff.*" (emphasis added).

As such, they did not claim strictly on the contract, and are not limited to relief on the contract. *See Leggett v. Mutual Commerce Casualty Co.,* 250 S.W.2d 995, 998–99 (Mo. 1952); *Woodruff v. Rusk,* 76 S.W.2d at 709. *Cf. Mecartney v. Guardian Trust Co.,* 274 Mo. 224, 202 S.W. 1131, 1136 (1918).

 Gardner contends further that his agreement to pay attorney fees owing by Craig was a contract of indemnity and not a third party beneficiary contract for the benefit of Hill, as is claimed by Hill. This is shown, says Gardner, by the clause in the contract which stated that Gardner would not "defend any suit for attorney fees brought on behalf of other attorneys." We agree that the contract was not a third party beneficiary contract, but neither was it an indemnity contract. Rather, it appears that Gardner intended to reassure Craig that he would not be liable for more than one attorney fee by promising that he, Gardner, would pay out of any fee he collected any sum due and owing other attorneys then employed by Craig. In other words, this is a simple case of a contingent promise by Gardner to pay any sum Craig owed to other attorneys, in addition to the

performance of legal services, in return for Craig's promise to pay Gardner 40 percent of any recovery effected on the accidents after trial.

### IV.

■ We see no need to remand this case, which has already been in the courts a long time, for a hearing to determine the reasonable value of Hill's services to Craig for the period from the date of original employment, December 18, 1971 to date of discharge July 30, 1973, if we can take care of the matter here.

We are ourselves experts on the question of attorney's fees, *Agnew v. Johnson,* 352 Mo. 222, 176 S.W.2d 489, 493–94; *Cascio v. Cascio,* 485 S.W.2d 857, 861 (Mo.App.1972); *Columbian Nat. Life Ins. Co. v. Keyes,* 138 F.2d 382 (8th Cir. 1943), *cert. denied,* 321 U.S. 765, 64 S.Ct. 521, 88 L.Ed. 1061 (1944), and we have by our rule 4, DR 2–106(B) set forth the factors to be considered in determining the reasonableness of a fee.

While we do not know how many hours Mr. Hill or his associate spent on the case, it has been held that time taken to perform the services is only one element considered and is ordinarily of minor importance, *Scott v. Home Mut. Tel. Co.,* 510 S.W.2d 793, 795 (Mo.App.1974), and we do know what Hill and his associate did in the matter and the result accomplished. The federal Employers Liability Act has a relatively short statute of limitations—three years—and one thing which Hill accomplished was to file a petition which unquestionably stopped the statute of limitations from running. Therefore, although 19 months elapsed without much being done toward preparing for trial during the time Hill was in charge of the case, Craig did not have to fear that his law suit would be barred by procrastination in filing suit. Hill's associate, Wilson, answered interrogatories served by the railroad, a necessity in keeping Craig's suit alive. He also filed interrogatories for Craig directed to the railroad. The information obtained therefrom does not appear in the record. We repeat what we said earlier as to what Wilson did: Wilson obtained medical reports from two doctors. None was of recent vintage. It is not clear from the record how complete these reports were or what use was made of them. One was from the treating physician. Wilson talked with him on the telephone, but did not feel it necessary to meet with him. Wilson made a settlement proposition to the railroad, to which there was no response. Wilson resisted, but lost, a motion to produce Craig's income tax returns. He reached an agreement with the railroad, following filing of injunction action, that Craig need not file a medical report for each day he was unable to complete his shift because of his injuries. The details of this aspect of the case do not appear clearly in the record. It apparently was directed more at Craig's being permitted to work part time than toward preparation for trial of disposition of his action for damages. Hill and Wilson also handled a medical benefits claim for Craig against Travelers Insurance Company, obtaining a $650.00 settlement, for which they received a fee of $200.00. Neither Hill nor Wilson did any of the trial work in the case against the railroad and it is fair to say they did little of the essential trial preparations.

All in all, we believe a fee of $1,500.00 is reasonable and fix the fee of Hill and Wilson at that amount plus whatever interest has been earned on said amount by investment.

### V.

Gardner claims that Craig assigned his right to raise the constitutional validity of 45 U.S.C., § 362(*o*) (1976), as well as the right to recover sickness benefits if such section is unconstitutional, to him. The only evidence of this, however, is the following statement in Gardner's brief:

> "During pendency of appeal and before filing of transcript there was a settlement of all claims between Jo B. Gardner, Inc., and William E. Craig and as part of said settlement it is provided:
>
> 'The undersigned further agree that William E. Craig, Jo B. Gardner or Jo B. Gardner, Inc. will have the right to raise

in their own or the others names the invalidity of the Federal Statute (45 U.S.C.A., Sec. 362(*o* )) for repayment of sickness benefits and that any recovery thereunder for fees and expenses will inure to the sole benefit of Jo B. Gardner, Inc.' "

■ We note, first, that the purported assignment involved only an attempt to assign to Gardner Craig's right to raise the invalidity of the federal statutes for repayment of sickness benefits and the right to recover fees and expenses recovered if § 362(*o* ) is found invalid. It does not purport to assign the sickness benefits per se, if it is found, as alleged, that payment to the Board violates the 14th Amendment. Secondly, we note that proof of the assignment cannot be made by a simple statement in the brief that assignment has been effected, *Slivka v. Hackley,* 418 S.W.2d 89 (Mo.1967); *Commercial Credit Equipment Corp. v. Colley,* 485 S.W.2d 625 (Mo.App. 1972), absent concession thereof by the opposing party. *Natasio v. Cinnamon,* 295 S.W.2d 117 (Mo.1956); *Hammack v. White,* 464 S.W.2d 520 (Mo.App.1971); *Avalon Development Co. v. American Italian Const. and Development Co.,* 437 S.W.2d 702 (Mo. App.1969).

Gardner has made no attempt to supplement the record to show proof of assignment, which is alleged to have occurred prior to the filing of the transcript in this court, or otherwise to show proof of assignment in the record. Accordingly, we cannot consider any claims which Gardner would have standing to raise only if the assignment were of record, for there is no proof of the assignment before this court. *Rawlings v. Taylor,* 477 S.W.2d 737 (Mo.App. 1972). *See* rule 81.12.[9]

■ However, Gardner makes a claim in his own right that he was deprived of his property without due process of law in that under § 363(*o* ), *supra,* the United States Railroad Retirement Board is entitled to a lien on any sums collected by the injured employee Craig, from the tortfeasor, in reimbursement for and up to the amount of any sums paid or payable to Craig, without concurrent liability for part of the attorneys fees expended in recovering the judgment against the third party. Gardner has failed to allege any injury to him as a result of this argument. He makes no claim that he has not received his fee [10] or was otherwise aggrieved, and thus has no right to appeal under § 512.020, RSMo 1969, or standing to raise the constitutionality of the statute. *See Ewing v. City of Springfield,* 449 S.W.2d 681, 688 (Mo.App.1970); *State v. Mucie,* 448 S.W.2d 879 (Mo.1970), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1842, 26 L.Ed.2d 271 (1970); *Kansas City v. Douglas,* 473 S.W.2d 101, 102 (Mo.1971). *Compare Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Ryder v. County of St. Charles,* 552 S.W.2d 705, 707–08 (Mo. banc 1977).

### VI.

To summarize: Hill is entitled to judgment of $1,500.00 plus interest earned from investment of said sum. Gardner is entitled to judgment for the balance of whatever remains of the $5,200.00 and interest earned after deducting the amount due Hill. The costs of this appeal are ordered assessed against Hill and Gardner equally.

The judgment is reversed and the cause remanded for entry of judgment in accordance with this opinion.

BARDGETT, C. J., RENDLEN and MORGAN, JJ., and STOCKARD, Special Judge, and FINCH, Senior Judge, concur.

DONNELLY, J., not sitting.

WELLIVER and HIGGINS, JJ., not participating because not members of the court when cause was submitted.

---

9. In his reply brief, Gardner states that if the assignment is not properly before this court, we should "let Craig have it back" and they will settle things between themselves. Craig has not appealed from the decision of the circuit court or asked to assert these constitutional claims. We have no authority to address them as if he had.

10. Gardner's fee was $8,320.00, which is 40 percent of the judgment, as agreed. The $2,514.60 allowed the Board came ·out of Craig's share, not Gardner's.